IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Zita L. Weinshienk

Civil Action No. 07-cv-02280-ZLW-MJW

ANJANETTE L. QUINN,

      Plaintiff,

v.

CITY OF EVANS POLICE DEPARTMENT, a department of a Colorado municipality,
CHIEF OF POLICE LEO CARILLO, individually and in his official capacity;
LT. GARY KESSLER, individually and in his official capacity; and
SGT. MICHAEL PARKOS, individually and in his official capacity,

      Defendants.

---

**ORDER**

---

      The matters before the Court are Plaintiff's Motion For Partial Summary Judgment (Doc. No. 31) and Defendants' Cross-Motion For Summary Judgment And To Enforce Settlement Agreement (Doc. No. 49).  The Court has determined that the motions can be resolved on the parties' briefing and that no oral argument is necessary.

**I.    Background and Undisputed Facts**

      Plaintiff was employed by Defendant City of Evans Police Department (Evans P.D.) as a police officer.[1]  In early 2007, an internal investigation was initiated by Evans P.D. which centered on Plaintiff's alleged misuse of the emergency communication

---

[1]Am. Compl. (Doc. No. 2; Dec. 10, 2007) at 3 ¶ 10.

system.[2]  Following the investigation, Defendant Leo Carrillo, the Evans P.D. chief of

police, terminated Plaintiff's employment on April 24, 2007.[3]

Plaintiff previously had filed an EEOC charge of discrimination and retaliation

against Evans P.D. on December 30, 2006.[4]  Plaintiff received a right to sue letter on

July 30, 2007.[5]

During the summer of 2007, Plaintiff expressed her interest in pursuing a

settlement agreement concerning her employment with Evans P.D.[6]  Attorneys for

Plaintiff and Defendants subsequently drafted a "Resignation Agreement And General

Release" (RAGR).[7]  Defendants Evans P.D., Sgt. Michael Parkos, and Lt. Gary Kessler

signed the confidentiality provisions on Setpember 21, 2007, Plaintiff signed the

agreement on September 25, 2007, and the City of Evans approved the agreement on

October 2, 2007.[8]

---

[2]Id. at 5 ¶ 22; Defs.' Mem. Br. In Supp. Of Cross-Motion For Summ. J. And To Enforce Settlement Agreement [hereinafter Defs.' Br.] (Doc. No. 50; Nov. 25, 2008), Ex. A.

[3]Defs.' Br., Ex. A.

[4]Scheduling Order (Doc. No. 13; Apr. 14, 2008) at 4.

[5]Am. Compl., Ex. A.

[6]Defs.' Br., Ex. B.

[7]Id., Ex. F.

[8]Id.  The City's approval was indicated via a signature by Aden Hogan, the City Manager. Id.

After signing the RAGR, the parties disagreed about a proposed non-disparagement agreement to be signed by Plaintiff.[9]  The non-disparagement agreement would have required Plaintiff not to disparage Parkos and Kessler "by way of any direct written or oral communication to any current employees of the City of Evans."[10]  Defendants believed that Plaintiff's signature on this document was *quid pro quo* to Parkos and Kessler signing the confidentiality agreements attached as Exhibit B to the RAGR.[11]  Plaintiff did not believe that this non-disparagement agreement was required by the RAGR and refused to sign it.[12]  Plaintiff claims that it was her understanding that, due to her failure to execute this additional agreement, Defendants were not going to honor the RAGR.  Therefore, Plaintiff claims she felt obligated to file her federal action before the ninety day EEOC right-to-sue period expired in order to protect her claims.[13]  The present action was filed on October 28, 2007.[14]

---

[9]Pl.'s Mot. For Partial Summ. J. Incorporating Legal Authority [hereinafter Pl.'s Mot.] (Doc. No. 31; Aug. 15, 2008), Ex. A (Affidavit of Plaintiff).

[10]Id., Ex. B.

[11]See Defs.' Br., Ex. H.

[12]See Pl.'s Mot., Ex. A.

[13]Id., at 3-4.

[14]See Compl. (Doc. No. 1).

3

By November 9, 2007, Defendants had agreed to waive the condition that Plaintiff execute the non-disparagement agreement.[15]  Defendants received notice of this lawsuit on November 20, 2007.[16]

## II.     Relief Requested

In her Sixth Claim For Relief in her Amended Complaint, Plaintiff seeks a declaratory judgment that "by filing . . . this action [she] mitigated her damages and accepted the rescission of the contract by [Evans P.D.], and as the parties are now substantially restored to their status prior to the settlement asks this Court to declare that the settlement agreement [RAGR] is rescinded."[17]  Plaintiff seeks summary judgment in her favor on this claim.  Defendants argue that the non-disparagement agreement was a necessary part of the RAGR and failure of Plaintiff to sign it constitutes a breach of contract by Plaintiff, not Defendants.  Alternatively, Defendants argue that the RAGR was never rescinded and instead remains controlling as to all parties.  Defendants seek summary judgment on all claims.

---

[15]Defs.' Br., Ex. P (Osborne Deposition) & Ex. G (Hugdahl Deposition).

[16]Id., Ex. A at ¶ 5 & Ex. G at 26-27.  Plaintiff alleges she heard "rumor[s]" that city employees, including Parkos, may have had notice of the lawsuit by reading the details of the lawsuit on the Internet "probably [in] early November-ish.  I'm not sure of the date.  I don't know." Pl.'s Resp. To Defs.' Cross-Motion For Summ. J. Incorporating Legal Authority (Doc. No. 56; Dec. 18, 2008), Ex. 1 at 12 (38:1-22).  Besides the fact that this statement is hearsay, Plaintiff does not refute that neither she nor her attorneys gave formal notice of the federal lawsuit until it was served on Defendants.

[17]Am. Compl. at 11 ¶ 65.

### III.    Summary Judgment Standard

Summary judgment is proper when there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.[18]  A dispute is "genuine" if the issue could be resolved in favor of either party.[19]  A fact is "material" if it might reasonably affect the outcome of the case.[20]

A party who does not have the burden of proof at trial must show the absence of a genuine fact issue.[21]  Once the motion has been properly supported, the burden shifts to the nonmovant to show, by tendering depositions, affidavits, and other competent evidence, that summary judgment is not proper.[22]  All the evidence must be viewed in the light most favorable to the party opposing the motion.[23]  However, conclusory statements and testimony based merely on conjecture or subjective belief are not competent summary judgment evidence.[24]

---

[18]Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

[19]Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

[20]Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

[21]Concrete Works of Colorado, Inc. v. City and County of Denver, 36 F.3d 1513, 1517 (10th Cir. 1994).

[22]Id. at 1518.

[23]Simms v. Oklahoma ex rel. Dep't of Mental Health and Substance Abuse Servs., 165 F.3d 1321, 1326 (10th Cir. 1999).

[24]Rice v. United States, 166 F.3d 1088, 1092 (10th Cir. 1999).

## IV.    Analysis

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.  Venue is proper in this court pursuant to 28 U.S.C. § 1391.  The Court finds that there is no genuine issue of material fact and, therefore, summary judgment is appropriate to resolve the current motions.

### 1. Resignation Agreement And General Release

Analysis begins with examination of the RAGR.  Normally "issues involving the formation, construction, and enforceability of a settlement agreement are resolved by applying state contract law."[25]  Additionally, the RAGR contains an explicit Colorado choice of law provision.[26]  However, the United States Court of Appeals for the Tenth Circuit has held that "[f]ederal common law governs the enforcement and interpretation of [Title VII] agreements because the 'rights of the litigants and the operative legal policies derive from a federal source.'"[27]  The RAGR must be considered a Title VII settlement agreement because one of the items bargained for by the parties was Plaintiff's release of any claims under "Title VII of the Civil Rights Act, as amended."[28]

---

[25]United States v. McCall, 235 F.3d 1211, 1215 (10th Cir. 2000) (citing Carr v. Runyan, 89 F.3d 327, 331 (7th Cir. 1996)).

[26]Defs.' Br., Ex. F at 7 ("This Agreement shall be governed by the laws of the State of Colorado.").

[27]Snider v. Circle K Corp., 923 F.2d 1404, 1407 (10th Cir. 1991) (citing Flugence v. J. Ray McDermott & Co., 662 F.2d 1207, 1209 (5th Cir. 1981)).

[28]Defs.' Br., Ex. F at 2.

6

The Tenth Circuit has never resolved the question of which jurisdiction's common law controls when a Title VII settlement agreement contains a choice of law provision.[29] However, there are no significant differences between Colorado and federal law regarding the issues in this case. The parties do not assert the contrary and instead they refer to both federal and Colorado case law throughout their briefs. Therefore, it "make[s] no difference if . . . [the Court] consult[s] state instead of federal law or vice-versa."[30] This Court will cite to Colorado cases, primarily because Colorado case law is more developed and informative.

The undisputed facts indicate that as of October 2, 2007, all parties to the RAGR had signed the agreement. Neither party disputes that at this time they were bound by the conditions of the RAGR. Defendants instead argue that since the parties had negotiated for Plaintiff to execute a non-disparagement agreement in consideration of the confidentiality agreements signed by Defendants, failure to execute this document constitutes a breach by Plaintiff.

To determine the contractual duties resulting from their negotiations, the Court first turns to the language contained in the RAGR. Interpretation of a settlement agreement is a question of law.[31]

---

[29]See Youngs v. American Nutrition, Inc., 537 F.3d 1135, 1140 (10th Cir. 2008); Foster v. Turley, 808 F.2d 38, 41 (10th Cir. 1986).

[30]Youngs, 537 F.3d at 1140.

[31]CMCB Enterprises, Inc. v. Ferguson, 114 P.3d 90, 94 (Colo. App. 2005); McCall, 235 F.3d at 1215.

> The primary goal of contract interpretation is to determine and give effect to the intention of the parties.  The intent of the parties to a contract is to be determined primarily from the language of the instrument itself.
>
> . . .
>
> [W]ritten contracts that are complete and free from ambiguity will be found to express the intention of the parties and will be enforced according to their plain language.  Extraneous evidence is only admissible to prove intent where there is an ambiguity in the terms of the contract.  Absent such ambiguity, we will not look beyond the four corners of the agreement in order to determine the meaning intended by the parties.[32]

Examining the RAGR, the Court finds the language is free of any mention of a non-disparagement agreement, let alone any other form of *quid pro quo* consideration. Indeed, Defendants point to no specific language in the document that supports their argument.  There is no ambiguity about the contractual language; the language simply does not exist.  The mere presence of confidentiality agreements signed by some of the Defendants does not stand for the proposition that a matching agreement from Plaintiff was either necessary or forthcoming.  This assumption would be reading terms into the contract that are non-existent.

Most important, the presence of additional oral agreements between the parties is rendered moot by the presence of an integration clause in the RAGR: "[t]his Agreement contains the entire understanding of the parties hereto with respect to its subject matter and supersedes all prior oral and written agreements between the parties."[33]

---

[32]USI Properties East, Inc. v. Simpson, 938 P.2d 168, 173 (Colo. 1997) (citations omitted).

[33]Defs.' Br., Ex. G at 7.

> Integration clauses generally allow contracting parties to limit future contractual disputes to issues relating to the express provisions of the contract.  Therefore, the terms of a contract intended to represent a final and complete integration of the agreement between the parties are enforceable, and extrinsic evidence offered to prove the existence of prior agreements is inadmissible.  Even when extrinsic evidence is admissible to ascertain the intent of the parties, such evidence may not be used to demonstrate an intent that contradicts or adds to the intent expressed in the writing.[34]

The integration clause makes clear that as of September 25, 2007, the date on which Plaintiff signed the agreement, the RAGR consisted of the "entire understanding of the parties."  Evidence of negotiations regarding terms that do not appear in the RAGR, both prior and subsequent to its ratification and regardless of whether Plaintiff or her agents were willing participants, is irrelevant for purposes of the agreement memorialized in the RAGR.  These on-going negotiations related to a different agreement incorporating additional terms and ultimately never resulted in any formal agreement.  Further, no evidence of "mistake, fraud, duress, undue influence, or the like" is present that would invalidate the integration clause.[35]  Thus, the RAGR is a valid, binding contract that does not require a *quid pro quo* non-disparagement agreement from Plaintiff.

---

[34]Nelson v. Elway, 908 P.2d 102, 107 (Colo. 1995) (citations omitted).

[35]Ringquist v. Wall Custom Homes, LLC, 176 P.3d 846, 849 (Colo. App. 2007) (citation omitted); see also Blackledge v. Allison, 431 U.S. 63, 75 (1977).

*2. Mutual Mistake*

Plaintiff argues that the RAGR, although initially binding, was invalidated under the doctrine of mutual mistake.  Mutual mistake occurs "when parties to a contract ascribe different meanings to a material term of a contract [and thus] the parties have not manifested mutual assent, no meeting of the minds has occurred, and there is no valid contract."[36]  Plaintiff argues that since the parties disagreed on whether a non-disparagement agreement was required, and this disagreement was a "material term" since both sides indicated an unwillingness to honor the agreement absent acquiescence from the other party,[37] this constitutes a mutual mistake and the RAGR is void.

Plaintiff claims the present case is analogous to Bejmuk v. Russel.[38]  In Bejmuk, the parties were involved in the purchase of a house and entered an agreement which described the formula to determine the balance due as of the closing date and required buyer to make monthly payments towards the balance "until paid in full."[39]  Several years later, the parties disagreed as to the amount due: buyer believed the monthly payments applied entirely to the principal while seller believed the payments applied to

---

[36]Sunshine v. M.R. Mansfield Realty, Inc., 575 P.2d 847, 849 (Colo. 1978) (citing Carpenter v. Hill, 283 P.2d 963 (Colo. 1955)).

[37]See, e.g., Pl.'s Mot., Ex. E; Defs.' Br., Ex. I.

[38]Bejmuk v. Russel, 734 P.2d 122 (Colo. App. 1986).

[39]Id.

the principal via an amortization schedule.[40]   The <u>Bejmuk</u> court found that "neither party,

at the time of the contract, was aware that the other attached a different meaning to a

necessary contractual provision that was not stated in the written contract."[41]   The

parties never agreed on or discussed payment specifics and neither party was aware of

the other's viewpoint until long after the contract had been signed.[42]   Accordingly, the

court found there had been no meeting of the minds and ordered rescission of the

contract.[43]

<u>Bejmuk</u> is distinguishable from the present case.   In <u>Bejmuk</u>, the mistaken

material term was <u>contained in the contract</u>.   Neither party disputed the amount of the

initial balance or the monthly payment, the terms defined in the contract.   The trouble

arose because neither party anticipated the potential consequences of the application of

the terms since these consequences were never discussed or negotiated.

Conversely, in the present case the alleged mistake stems from a material term

that is <u>absent from the contract</u>.   The parties are not disagreeing over the application of

terms contained in the contract; *they are arguing whether a term was part of the*

*contract at all*.   Unlike <u>Bejmuk</u>, the parties were aware of the possibility and

---

[40]<u>Id.</u>

[41]<u>Id.</u>

[42]<u>Id.</u>

[43]<u>Id.</u> at 124.

consequences of a non-disparagement agreement since the parties were admittedly

discussing and negotiating this issue contemporaneously with the drafting of the RAGR.

Since the non-disparagement term was not part of the RAGR, by definition it can

not be a material term of the contract.  As such, there was no mutual mistake of a

material term and the contract can not be invalidated on those grounds.

### 3. Repudiation

Plaintiff alternatively argues that the Defendants repudiated the RAGR through

their statements and actions, and Plaintiff manifested her acceptance of the repudiation

by filing this lawsuit.  Defendants counter that they never repudiated the RAGR or,

alternatively, that Plaintiff's acceptance of the repudiation was insufficient because

Defendants retracted the repudiation prior to receiving formal notice of Plaintiff's

acceptance of the repudiation.[44]

"A repudiation of a contract must consist of a party's present, positive,

unequivocal refusal to perform the contract, not a mere threat to abandon its obligations

under the contract."[45]  A "[m]ere expression of doubt as to [a party's] willingness or

---

[44]See Johnson v. Benson, 725 P.2d 21, 25 (Colo. App. 1986) ("A repudiation may be retracted when the repudiator notifies the injured party that he will proceed with his performance.").

[45]Lawry v. Palm, 192 P.3d 550, 558 (Colo. App. 2008) (citing Lake Durango Water Co. v. Pub. Utils. Comm'n, 67 P.3d 12, 21 (Colo. 2003)); see also Lantec, Inc. v. Novell, Inc., 306 F.3d 1003, 1014 (10th Cir. 2002) ("A repudiation occurs when a party to a contract makes 'an overt communication of intention or an action which renders performance impossible or demonstrates a clear determination not to continue with performance.'" (quoting U.C.C. § 2-610 cmt. 1 (1989))).

ability to perform is not enough to constitute a repudiation."[46]  A repudiation "must be

apparent in the objective sense."[47]

After the RAGR was signed, the parties engaged in continued discussions about

the non-disparagement agreement throughout October 2007.  During this period,

Defendants voiced their unwillingness to honor the RAGR without a signed non-

disparagement agreement.[48]  Despite their disagreement, the parties continued their

negotiations.

Plaintiff's basis for Defendant's alleged repudiation derives from a voicemail left

on October 24, 2007 for Dave Osborne, Plaintiff's attorney, by Heidi Hugdahl,

Defendants' attorney.[49]  In her message, Hugdahl explained that she had talked with

several city officials about the non-disparagement negotiations and

> they feel real strongly that, as we do, that it was part of the
> whole settlement and everything was negotiated as part of that
> and that . . . we gave her a nondisparagement, in exchange,
> she would give us some nondisparagement on our folks.  So
> at the end of the day, I think that they feel real strongly about
> that, and I guess all bets are off now.  So I'm not sure where
> that leaves you. . . . [T]hat's where we're at with that piece, and
> I'm not sure where that leaves us or where that leaves you, or

---

[46]Lawry, 192 P.3d at 558 (citing Lantec, Inc., 306 F.3d at 1014 (quoting Restatement (Second) of Contracts § 250 cmt. b (1979))).

[47]Lawry, 192 P.3d at 558.  "In order to constitute a repudiation, a party's language must be sufficiently positive to be reasonably interpreted to mean that the party will not or cannot perform." Id. (quoting Restatement (Second) of Contracts § 250 cmt. b).

[48]See, e.g., Defs.' Br., Ex. H.  The evidence likewise indicates that Plaintiff told Defendants that she would not honor the RAGR if required to sign the non-disparagement agreement. See, e.g., Pl.'s Mot., Ex. B.

[49]Am. Compl. at 11 ¶ 63; Pl.'s Mot., Ex. A at 3-4 ¶ 8, Ex. C at 3 ¶ 7, and Ex. D.

> whatever. And we can put it in writing, but I did want to talk to
> you about it first. So . . . try to give me a jingle back. . . . [I]'ll
> try to call you back if you call me.[50]

Both Plaintiff and Osborne testify that they believed the voicemail represented an ultimatum from Defendants: if Plaintiff did not sign the non-disparagement agreement then the RAGR was off.[51] Plaintiff testified that due to her unwillingness to sign the non-disparagement agreement, coupled with the impending EEOC filing deadline, she was compelled to accept the repudiation expressed in the voicemail and file this lawsuit in order to preserve her rights.[52]

In analyzing Plaintiff's repudiation claim, reviewing Colorado court decisions that have dealt with the conduct needed to effectuate a valid repudiation is instructive. In Johnson v. Benson, the parties entered into a conditional real estate contract.[53] Sellers, pursuant to the contract, set a closing date at which buyers did not appear.[54] Afterward, sellers sent a telegram to buyers which stated, in part, "[y]our contract is therefore null and void and all payments made by you will be retained . . . pursuant to [the contract's terms]."[55] The Benson court held that the "blunt and unequivocal language of the

---

[50]Pl.'s Mot., Ex. D at 1-2.

[51]See *supra* note 49.

[52]Pl.'s Mot., Ex. A at 4 ¶ 9.

[53]Johnson, 725 P.2d at 23.

[54]Id.

[55]Id.

telegram . . . conveys a definite intention to terminate" the contract and affirmed the trial court's determination that sellers had repudiated the contract by sending the telegram.[56]

In Lake Durango v. PUC, the parties entered into an agreement which required Lake Durango (a for-profit water company) to be subject to regulations imposed by the Colorado Public Utilities Commission (PUC) and file its tariffs with the PUC by a certain date.[57]  After this date had passed, Lake Durango requested an extension to file its tariffs.[58]  The other party to the agreement, a water utility, wrote to Lake Durango objecting that this delay was a breach of the original agreement and that any further motions for extensions would be vigorously opposed by the utility.[59]  Lake Durango responded, in part, that it would never file the PUC tariffs since it instead planned to file an application to become a special water district outside of the jurisdiction of the PUC.[60]  The court held that Lake Durango's response constituted a repudiation of the contract because its statement that it would never file PUC tariffs was "an unequivocal refusal to perform an essential element of the agreement."[61]

---

[56]Id. at 23.

[57]Lake Durango, 67 P.3d at 16.

[58]Id.

[59]Id.

[60]Id. at 16, 21.

[61]Id. at 21.

In <u>Highlands Ranch v. Uno</u>, the parties entered into an agreement for the retail tenant to build on the lease site and occupy the property.[62]   Prior to the completion of the site preparation, tenant informed landlord it would not perform under the lease.[63] Subsequently, the site was tendered to the tenant who did not take possession and did not commence construction.[64]   Landlord notified tenant that unless notified otherwise, the lease would be terminated.[65]   Tenant did not respond.[66]   The court found that "tenant unequivocally told landlord on two occasions that it would not perform under the lease and . . . [additionally] suggested that landlord seek another tenant."[67]   The court held that tenant's actions "clearly evidence its definite intent not to perform" and constituted a repudiation.[68]

Finally, in <u>Lawry v. Palm</u>, plaintiff purchased a fishing and floating business from defendant.[69]   The parties entered into an agreement where plaintiff agreed to hire defendant as a consultant for ten years and defendant promised to hold an outfitting

---

[62]<u>Highlands Ranch Univ. Park, LLC v. Uno of Highlands Ranch, Inc.</u>, 129 P.3d 1020, 1022 (Colo. App. 2005).

[63]<u>Id.</u> at 1023.

[64]<u>Id.</u>

[65]<u>Id.</u>

[66]<u>Id.</u>

[67]<u>Id.</u>

[68]<u>Id.</u>

[69]<u>Lawry</u>, 192 P.3d at 556.

permit in trust for use by the business.[70]  Subsequently, the business relationship deteriorated and defendant sent several e-mails to plaintiff.[71]  The first stated "[y]ou are on your own."[72]  The second e-mail broadcast defendant's concern that the business he had founded was being mismanaged and that he would "like my name, web fishing reports, and any reference to or about me removed from . . . [the business].  I want real property as equity as insurance per our agreement. (not encumbered).  The shop has been working on my credit long enough."[73]  Plaintiff sent a letter to defendant stating that she "'accepted' defendant's 'desires' that were 'expressed' in his e-mails;" defendant did not respond to this letter.[74]  In several subsequent e-mails and meetings, neither defendant nor his attorneys indicated defendant wanted his job back.[75]  Conversely, defendant informed various government agencies and fellow employees that plaintiff could no longer operate under "his" permit and physically removed the permit from the business.[76]

---

[70]Id.

[71]Id. at 556-57.

[72]Id. at 556.

[73]Id. at 556-57.

[74]Id. at 557.

[75]Id.

[76]Id.

Plaintiff claimed that defendant had repudiated their agreement by his actions while defendant claimed that he was wrongfully terminated by plaintiff.[77]  The court found that defendant's e-mails were "not a mere threat to abandon his obligations under the employment portion of the agreement, but reflect an unequivocal refusal to perform the agreement," specifically an overt refusal to perform various enumerated contractual obligations.[78]  Additionally, the court found that even if the e-mails themselves were not sufficient to establish repudiation, they were supplemented by defendant's breach by nonperformance.[79]  The failure to mention his re-hire during ongoing meetings, the physical taking of the permit, informing others that he had reacquired possession of the permit, and evidence that he was thinking about starting a competing business all indicated that defendant's intent was immediately to cease performance of the contract.[80]  The court affirmed the trial court's determination of repudiation.

A determination of whether an anticipatory repudiation has occurred is "ordinarily" a question of fact.[81]  However, in the present case there is no genuine issue of material fact as to the statements and correspondence exchanged between the parties.  The Court finds that given this undisputed evidence, and viewing such

---

[77]Id. at 558.

[78]Id. at 559.

[79]Id.  "[L]anguage that is accompanied by a breach by nonperformance may amount to a repudiation even though, standing alone, it would not be sufficiently positive." Restatement (Second) of Contracts § 250 cmt. b.

[80]Lawry, 192 P.3d at 559.

[81]Johnson, 725 P.2d at 23.

evidence in the light most favorable to Plaintiff, there is no way a reasonable jury could conclude that Defendants had repudiated the RAGR.[82]

The critical requirement in repudiation cases is an "unequivocal" expression that a party intends to terminate.  In <u>Johnson</u>, this requirement was manifested in the telegram which stated "the contract is <u>null and void</u>."  In <u>Lake Durango</u>, the company's letter stated that it would <u>never</u> file tariffs (a requirement under the contract) because it instead was a special water district (as opposed to being regulated by the PUC as previously agreed to).  In <u>Highlands Ranch</u>, tenant twice told landlord that it <u>would not perform under the lease</u> and also suggested that landlord seek another tenant, something landlord could do only if tenant was not going to occupy the site as required under their agreement.  The language used in these cases - null and void, never, would not perform - is unequivocal in intent.

Here, the voicemail message is instead, at worst, a "mere threat to abandon."  The voicemail expressed how the City felt "real strongly" about the need for the non-disparagment agreement, and without it Defendants' attorney "<u>guesse[s]</u> all bets are off now."  Hugdahl was "<u>not sure</u> where that leaves" either party.  Hugdahl offers to "put it in writing," but not before talking with Plaintiff or her agents.  The terms "guess" and "not sure" are not unequivocal terms; they indicate uncertainty.  Not memorializing the content of the voicemail in writing until after discussion with the other side is likewise not

---

[82]<u>See</u> <u>Allstate Ins. Co. v. Brown</u>, 920 F.2d 664, 668 (10th Cir. 1990) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986)) ("The relevant question for the trial judge is whether the evidence is so one-sided that a reasonable jury could only arrive at one conclusion.").

unequivocal behavior.  If desired, Defendants could have drafted a strongly-worded, final, written repudiation and entertained no further discussion on the topic.  Further, resorting to colloquialisms, such as "all bets are off now," when clear, definite, unequivocal language is required, provides further indication that the voicemail was not a repudiation.

More important, unlike the cases discussed previously, the voicemail here was *conditional*.  In Johnson, Lake Durango, and Highlands Ranch, the repudiation statements were unconditional; in each instance, the repudiating language directly states the contract is over and will *never* be honored.  Non-conditional statements signal a "present, positive, unequivocal refusal to perform the contract."  Conversely, the language in the voicemail is consistent with a *final offer* in which a party must accept the terms provided (in this case, the non-disparagement agreement) or else the contract will be void.  This language is "merely a threat to abandon obligations under the contract" and thus, by definition, can not be a repudiation.

Additionally, Defendants did not perform any breach by nonperformance that is necessary to turn ambiguous language into a definite manifestation of repudiation. Unlike in Lawry, where the defendant performed multiple actions directly in contravention of the parties' agreement, Plaintiff here has neither shown nor alleged that Defendants ever violated the terms of the RAGR post-voicemail.  The uncontroverted evidence instead indicates that Defendants performed all duties

required under the contract (e.g. keeping Plaintiff's personnel file confidential) after ratifying the agreement.[83]

Finally, the evidence indicates that Defendants continued to debate whether the non-disparagement agreement was necessary, while continuing to discuss the issue with plaintiff's attorneys, culminating in the eventual decision to stop seeking it.[84]  In a true repudiation, continued discussion relating to the basis for the repudiation should be non-existent: once the contract is nullified, there is no reason for the repudiating party to continue to discuss the details of a non-existent agreement.  Continued negotiations, such as occurred in this case, are not consistent with a party's intention to repudiate.

The present case is most analogous to Meinhardt v. Investment Builders.  In that case, plaintiff entered into an oral contract with defendants, who were building an apartment complex, to perform electrical work.[85]  During construction, defendant made significant changes to the project increasing the scope of labor and materials required beyond what was contemplated by the original agreement.[86]  The parties negotiated the terms of a new agreement, but a written contract drafted by plaintiff was rejected by defendants.[87]  Plaintiff then wrote to defendants renewing his written contract offer or, alternatively, requiring payment for labor and materials expended to date after which

---

[83]Defs.' Br., Ex. A, C (35:4-8), I, Z, and A-1.

[84]Id., Ex. P (29:7-10, 22-25; 30:1-21; 35:2-8).

[85]Meinhardt v. Inv. Builders Props. Co., 518 P.2d 1376, 1378 (Colo. App. 1973).

[86]Id.

[87]Id.

plaintiff would complete the contract on a cost-plus basis.[88]  Plaintiff stated that if neither alternative was accepted, he would terminate work and would seek legal recourse.[89]  Defendants did not respond to the letter.[90]  Throughout this time, plaintiff continued to work on the project until defendants barred plaintiff from the job site.[91]

Defendants claimed that plaintiff's alternative proposal letter constituted a repudiation of the contract.[92]  The court disagreed and held that "a mere declaration of a contingent intention not to be bound will not of itself amount to a breach, so as to constitute a renunciation of the contract. . . . [T]he plaintiff's letter in the context of negotiation was not a repudiation of the contract."[93]  The court found that since there was no repudiation, preventing plaintiff from accessing the job site was a breach of contract by defendants.[94]

Similar to the letter in Meinhardt, the voicemail in this case was "a mere declaration of a contingent intention not to be bound" under certain circumstances.  The voicemail was produced "in the context of negotiation" as the parties were still hashing out the requirements of the RAGR.  As in Meinhardt, there was no present, positive,

_____

[88]Id.

[89]Id.

[90]Id.

[91]Id.

[92]Id. at 1379.

[93]Id. (citing Atkinson v. District Bond Co., 43 P.2d 867 (Cal. Dist. Ct. App. 1935)) (emphasis added).

[94]Id.

unequivocal refusal to perform the contract, just a threat of future inaction only if Defendants' terms were not ultimately met.  Like the plaintiff in <u>Meinhardt</u>, Defendants continued to perform under the contract while the negotiations continued.  Simply put, Defendants' voicemail was not a repudiation of the RAGR.

## V.   Conclusion

For the reasons discussed above, the RAGR, without a non-disparagement agreement, was a valid, binding contract on the parties.  Even though the parties disagreed on whether the non-disparagement agreement was a necessary term of the RAGR, this disagreement did not implicate the mutual mistake doctrine.  Finally, Defendants never repudiated the RAGR.  Therefore, Defendants are entitled to summary judgment on Claim Six.

As of the date this case was filed, the RAGR was binding on all parties.  By filing this lawsuit, Plaintiff appears to have breached the agreement.[95]  The question of breach is not before the Court in this case and, regardless, Defendants have indicated they wish to waive the breach and let the original RAGR control.[96]

---

[95]<u>See</u> Defs.' Br., Ex. F at 3 ¶ 4 ("Employee agrees and covenants that she . . . will not file any federal or state lawsuit . . . arising out of any actions or omissions . . . which occurred prior to the date of this Agreement.").

[96]<u>See</u> Defs.' Br. at 22.

Since the remainder of Plaintiff's claims are foreclosed in this Court pursuant to the express terms of the RAGR, summary judgment in favor of Defendants and against Plaintiffs on the remaining claims is appropriate pursuant to Fed. R. Civ. P. 12(b)(6).

## VI.   Order

It is ORDERED that Plaintiff's Motion For Partial Summary Judgment (Doc. No. 31; Aug. 15, 2008) is denied.  It is

FURTHER ORDERED that Defendants' Cross-Motion For Summary Judgment And To Enforce Settlement Agreement (Doc. No. 49; Nov. 25, 2008) is granted.  It is

FURTHER ORDERED that the Amended Complaint and cause of action are dismissed.  It is

FURTHER ORDERED that the parties shall pay their own costs and attorney's fees.

DATED at Denver, Colorado, this 24th day of July, 2009.

BY THE COURT:

*Zita L. Weinshienk*

ZITA L. WEINSHIENK, Senior Judge
United States District Court